SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Supreme Court |
| | ) | No. CR-00-0508-AP |
| Appellee, | ) | |
| | ) | Mohave County |
| v. | ) | Superior Court |
| | ) | No. CR-98-1243 |
| JAMES EDWARD DAVOLT, II | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court in Mohave County

The Honorable Steven F. Conn, Judge

**CONVICTIONS AFFIRMED; REMANDED WITH INSTRUCTIONS
TO CONSIDER DEATH PENALTY ELIGIBILITY ON CAPITAL
OFFENSES AND TO RESENTENCE ON NON-CAPITAL OFFENSES**

Janet Napolitano, Former Arizona Attorney General          Phoenix
Terry Goddard, Arizona Attorney General
      by   Kent E. Cattani, Chief Counsel
           Capital Litigation Section
    and   James P. Beene, Assistant Attorney General
Attorneys for Appellee


Julie S. Hall                                              Tucson
 Arizona Capital Representation Project                    Tucson
      by   Jennifer Bedier
Attorneys for Appellant

**J O N E S, Chief Justice**

¶1          James Edward Davolt II was convicted April 20, 2000 of

two counts of first degree murder -- the first for the killing of N.Z. predicated on the felony murder rule, and the second for the killing of E.Z., predicated on both felony murder and premeditation. Davolt was also convicted of one count of first degree burglary, one count of theft of property valued at $1,000 or more, one count of arson of an occupied structure, and one count of theft of means of transportation. Following a sentencing hearing, the trial judge sentenced Davolt to death for each of the murder counts and to consecutive sentences of twenty-one years for the burglary, two years for the theft, ten years for the arson of an occupied structure, and seven years for the theft of means of transportation. The direct appeal came to this court pursuant to Arizona Rule of Criminal Procedure 31.2(b). We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 13-4031 and -4033 (2001). For the following reasons we affirm Davolt's convictions but remand Davolt's death sentences to determine whether Davolt, a juvenile, possessed the maturity and moral responsibility at the time of the offenses sufficient to make him eligible for the death penalty. Also, because the record does not demonstrate that the trial court considered Davolt's age as a mitigating factor as to the sentences for the non-capital counts, we remand for resentencing on those counts.

## 1.    The Crime Scene

¶2    Early Thanksgiving morning, November 26, 1998, a paper delivery man noticed water streaming out from under the garage door and down the driveway of a house on Pueblo Drive in Lake Havasu, Arizona.  Thinking perhaps the water heater had burst, he contacted police to do a welfare check.  On arrival, the police discovered the house had sustained a fire.  An interior inspection revealed the charred bodies of an elderly man and woman, respectively N.Z. and E.Z., lying on the kitchen floor.  Burnt file folders were found on top of the bodies, a red metal gas can was between them, and an oscillating fan was at their feet.  A melted candle was in front of the fan.  Water was leaking from under the sink and had flooded the house.

¶3    Police found three .22 caliber shell casings in the living room and kitchen area of the house, as well as spots of blood in the dining room and kitchen, and in the backyard near the hose.  They also found a ceramic bowl filled with partially smoked Marlboro cigarettes on a table near an easy chair in the living room.  A wine box sat on the same table.  E.Z.'s walker was facing away from the kitchen counter.  The phone in the dining area was off the hook and had red duct tape on it.  The victims' dog was

---

[1]    We view the facts in the light most favorable to sustaining the verdict.  *State v. Gallegos,* 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

found alive, locked inside the master bathroom.

¶4    In the garage, police discovered a bloody roofing hatchet and a fresh strike mark on the door between the kitchen and the garage. A significant quantity of blood was splattered around the inside perimeter of the garage. Some of the blood was smeared in a linear pattern as if someone had tried to clean it up with a mop. An empty camping fuel can was found on the washing machine, alongside N.Z.'s bloody glasses. The victims' automobile was missing.

### 2.    The Bank Withdrawal

¶5    After learning of the deaths of their customers, Bank One officials notified police that a withdrawal had been made from the victims' bank account Tuesday, November 24, 1998. Further investigation revealed that a $1,500 check, made payable to James Davolt and signed by E.Z., had been cashed on the account at 10:46 a.m. that day. Davolt gave his thumb print and driver's license to the bank teller in order to cash the check. At trial, the bank teller positively identified Davolt as the person who had cashed the check that morning.

¶6    Bank records indicated that three unsuccessful ATM withdrawal attempts had been made on the victims' account earlier that morning. Bank security pictures from the drive-up ATM machine showed Davolt, driving the victims' car, attempting to make a withdrawal from their account at 9:55 a.m. The picture clearly

showed a short person riding in the passenger seat of the vehicle. A different picture showed Davolt attempting to make a withdrawal from the victims' account at the walk-up ATM a few minutes later. An hour later, at 10:46 a.m., a bank security camera captured Davolt, inside the bank, cashing the $1,500 check. He was wearing a Green Bay Packers shirt and cap.

¶7        Davolt's mother viewed the videotape, but told police she could not identify her son. She informed officers that Davolt did not own a Green Bay Packers' shirt. However, N.Z. was an "extreme" Packers fan.

### 3.    Sightings of Davolt, N.Z., and E.Z.

¶8        Davolt was sixteen years old and an eleventh grader at Lake Havasu High School. He was reported missing as of Monday afternoon, November 23, 1998, when he failed to return home from school. Although he left home as usual that Monday morning on his bicycle with a book bag, he never arrived at school.

¶9        A workman testified that he had seen Davolt riding a green mountain bike with a book bag on his back on Pueblo Drive around 9:00 a.m. that morning. He recalled that N.Z. had been walking his dog and Davolt had introduced himself to N.Z. The workman overheard N.Z. ask Davolt where he lived and Davolt pointed to the intersection with Sweetgrass Road. The workman saw Davolt speak with N.Z., ride up and down Pueblo Drive on his bike, lie on an air mattress under some power lines for a short time, then go

-5-

back to speak to N.Z. again. One of the conversations occurred in N.Z.'s garage. At another point, Davolt played with N.Z.'s dog for about forty-five minutes.

### 4. The California Arrest

¶10 On Friday, November 27, 1998, Lake Havasu detectives matched Davolt's fingerprints with those found at the crime scene on the ceramic bowl used as an ashtray, the gas can in the garage, and a mop handle. An arrest warrant was issued for Davolt in connection with the homicides and the missing vehicle.

¶11 At about 10:30 p.m. Sunday, November 29, 1998, in Beaumont, California, a local police officer spotted an oddly parked vehicle in the vacant parking lot of a nursery store. A plate check revealed that the vehicle had been reported stolen and that an arrest warrant had issued for a James Davolt in connection with a theft and two homicides. While the officer was investigating, a young man walked up and stated he was the owner of the car. The young man identified himself as James Davolt. The officer placed Davolt under arrest and handcuffed him.

¶12 A pat down produced a key with the number "101" that looked like a motel room key. The officer immediately questioned Davolt about the key, asking whether it was to a hotel room, and, if so, which hotel. Davolt responded that the key was to a room at the Windsor Motel in Beaumont, California.

¶13 Davolt was first advised of his *Miranda* rights at

approximately 1:00 a.m. Monday, November 30, 1998, when he was booked into custody at the police station in Beaumont.  He invoked both his right to counsel and his right to remain silent.  He was then placed in a holding cell until police officers from Lake Havasu, Arizona, arrived at approximately 5:30 a.m.  These officers also advised Davolt of his *Miranda* rights.  Once again he invoked his right to remain silent and asked to speak with a public defender.  Police officers then promised Davolt that anything he said could not be used against him and proceeded to question Davolt about the homicides for approximately forty-five minutes, during which time Davolt made several inculpatory statements.

¶14     Within minutes of obtaining Davolt's inculpatory statements, officers again approached Davolt and requested that he sign a written consent to search the motel room.  Davolt signed the consent form, and police relied on it to enter the room later that morning, at which time they seized the following items:  a toy remote control vehicle; a Green Bay Packers shirt, jacket and cap; red duct tape; a black duffel bag containing clothing belonging to N.Z.; cut-off jean shorts stained with Davolt's blood; a crossword puzzle book and files belonging to E.Z. and N.Z.; and two medallions, each with numbers written on the reverse side.

¶15     The vehicle was identified as belonging to the victims. The passenger compartment contained Davolt's school books, food wrappers, packs of Marlboro cigarettes, the book, *Masters of*

*Deceit*, by J. Edgar Hoover, and a lunch ticket from Lake Havasu High School. A bank card and insurance documents belonging to E.Z. and N.Z. were found in the glove compartment, and a partially dismantled mountain bike was found in the trunk.

### 5.    The Forensic Investigation

¶16    The forensic investigation revealed that the blood in the garage, kitchen, dining room, and backyard belonged to N.Z. A flame accelerant, such as camping fuel or lighter fluid, was detected on the clothing samples taken from the victims. The fire had originated between the victims' bodies and reached a temperature of at least 300 degrees. The fire and heat caused a leak in the reverse osmosis system under the sink, and water from the sink area had flooded the house. The arson investigator testified the fire had eventually extinguished itself due to a lack of oxygen.

¶17    The autopsy results established that N.Z. had sustained three lacerations to the head: one on the front part of the left scalp, one to the top of the head, and one to the midline back of the head. The wounds were caused by a sharp-edged instrument and were consistent with the shape of the bloody hatchet found in the garage. These wounds were not immediately fatal. N.Z. also sustained three gunshot wounds to his chest from .22 caliber shot pellets. Similarly, these wounds were not immediately fatal. All three shots were fired from the same firearm.

¶18    The autopsy results established that E.Z. sustained a blow to the back of her head and had been strangled manually. It would have taken several minutes for her to lose consciousness and several more minutes to die. Skin missing from both E.Z.'s wrists was consistent with abrasions from adhesive tape. Both victims died before the fire began because no trace of smoke or soot was found in the trachea of either victim. Medical experts testified that E.Z. died sometime between Tuesday and Wednesday evening and that N.Z. predeceased her by twenty-four to forty-eight hours.

¶19    Davolt's right palm print was positively identified on the mop handle found in the kitchen of the victims' home. Davolt's fingerprints were positively identified on the camping fuel can found in the garage and on the wine box and ceramic bowl found in the living room. In addition, Davolt's DNA, matching at all fourteen loci tested, was found on the 10 to 15 partially smoked Marlboro cigarettes in the ceramic bowl.

### 6.    Last sightings of N.Z. and E.Z.

¶20    A neighbor reported last seeing N.Z. on Monday or possibly Tuesday, around noon. E.Z.'s son testified that he spoke on the phone with his mother on Tuesday. He recalled that she had responded with one-word answers, which was unusual. The mail carrier recalled that water had been running down the driveway when she delivered the mail on Wednesday around 11:15 a.m. Although N.Z. usually greeted her, she did not see him that day. She thought

perhaps N.Z. was washing his car inside the garage with the door closed. Three unopened newspapers were in the driveway when police arrived at the residence Thanksgiving morning.

## DISCUSSION

## I. PRETRIAL ISSUES

### A. Motion to Suppress

#### 1. The Interrogation and Room Search

¶21 Davolt claims the trial court erroneously denied his motion to suppress evidence seized during a search of his room at the Windsor Motel in Beaumont. We review for abuse of discretion the trial court's factual findings on a motion to suppress, *State v. Peters,* 189 Ariz. 216, 218, 941 P.2d 228, 230 (1997), but review *de novo* the trial court's ultimate legal determination that the search complied with the requirements of the Fourth Amendment to the United States Constitution, *see State v. Valle,* 196 Ariz. 324, 326, ¶ 6, 996 P.2d 125, 127 (App. 2000).

¶22 The trial court found that one Fourth Amendment and two Fifth Amendment violations occurred during Davolt's arrest and initial detention. We agree. But we disagree with the trial court's legal conclusion that each of the three violations was curable under the doctrine of inevitable discovery.

¶23 The Fourth Amendment provides: "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S.

-10-

Const. amend. IV. The provision applies to action by state officers under the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655 (1961). Hotel guests are entitled to full constitutional protection against unreasonable searches and seizures. *Stoner v. California,* 376 U.S. 483, 490 (1964); *Eng Fung Jem v. United States,* 281 F.2d 803, 805 (9th Cir. 1960) (the transience of a defendant's stay in a temporary residence does not dilute the constitutional protection afforded).

¶24 Article 2, section 8 of the Arizona Constitution, as well, protects the right to privacy in temporary residences. *See State v. Gissendaner,* 177 Ariz. 81, 84, 865 P.2d 125, 128 (App. 1993) (overnight guest has an expectation of privacy under the state and federal constitutions). To be lawful, the search of the motel room must have been based on a valid warrant, exigent circumstances, or valid consent. *State v. Castaneda,* 150 Ariz. 382, 389, 724 P.2d 1, 8 (1986). Our examination of the record reveals not one of them was present in this case.

¶25 Police learned of the location of Davolt's motel as a consequence of improper custodial interrogation, in violation of Fifth Amendment requirements under *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). After arresting Davolt and placing him in handcuffs, with no *Miranda* warning, the arresting officer questioned Davolt about the key found in his pocket. This interrogation took place after the arrest, while Davolt was in

-11-

custody, but prior to the *Miranda* warning, a clear violation of the requirements of *Miranda* and the Fifth Amendment. *Id.*

¶26    A second Fifth Amendment violation occurred at the police station immediately after Davolt invoked his *Miranda* rights a second time at approximately 5:55 a.m. on Monday, November 30. In this instance, officers from Lake Havasu, Arizona, questioned Davolt about the murders for about forty-five minutes, during which time Davolt made several inculpatory statements. Once an accused asserts his right to counsel, the interrogation must cease until counsel is present or until the accused validly waives his request. *Id.* at 473-74; *State v. Eastlack,* 180 Ariz. 243, 250, 883 P.2d 999, 1006 (1994). A valid waiver of the right to counsel cannot be established by showing only that the defendant responded to further police-initiated custodial interrogation, even if he has been advised of his rights. *Edwards v. Arizona,* 451 U.S. 477, 487 (1981).

¶27    Also, this interrogation violated Davolt's rights because his statements to police were involuntary (a point conceded by the State at trial). After Davolt invoked *Miranda*, police expressly promised Davolt that anything he said could *not* be used against him. A confession "obtained by any direct or implied promises, however slight," is involuntary. *Hutto v. Ross,* 429 U.S. 28, 30 (1976); *see also State v. Amaya-Ruiz,* 166 Ariz. 152, 165, 800 P.2d 1260, 1273 (1990).

-12-

¶28     In addition, a Fourth Amendment violation occurred when police searched the motel room solely on the strength of a consent that had been tainted by the earlier interrogation violation under the Fifth Amendment.  Within minutes of obtaining Davolt's involuntary inculpatory statements, officers approached Davolt requesting that he sign a written consent to search the room. Davolt then signed the form and police officers obtained the items of physical evidence in the motel search later that morning.

¶29     A search conducted without a warrant, based on probable cause, is nonetheless *per se* unreasonable, subject only to a few specifically established exceptions.  *Katz v. United States,* 389 U.S. 347, 357 (1967).  One of these is valid consent.  *Id.*  To be valid, consent must be voluntary.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 249 (1973).  Voluntariness is a question of fact to be determined from the totality of the circumstances.  *Id.* at 248-49. However, evidence obtained based on voluntary consent must still be suppressed if "the unconstitutional conduct was not sufficiently attenuated from the subsequent seizure to avoid exclusion of the evidence."  *United States v. Taheri,* 648 F.2d 598, 601 (9th Cir. 1981) (citing *Brown v. Illinois,* 422 U.S. 590, 602 (1975)); *see also United States v. Delgadillo-Velasquez,* 856 F.2d 1292, 1299 (9th Cir. 1988) (consent that meets the threshold voluntariness determination for Fifth Amendment purposes was not valid under the Fourth Amendment where consent was given almost immediately after

illegal arrest).

¶30     To determine whether there was sufficient attenuation between the illegal police conduct and the defendant's consent, we examine 1) whether *Miranda* warnings were administered; 2) the temporal proximity between the initial illegality and the defendant's consent; 3) whether there were intervening circumstances; and 4) the purpose and flagrancy of the official conduct. *Brown,* 422 U.S. at 602.

¶31     As discussed, Davolt was advised of his *Miranda* rights on two occasions before he signed the consent form. He invoked his Fifth Amendment right to counsel and right to remain silent both times. The temporal proximity between the custodial interrogation and his consent was less than one hour. This time period alone is insufficient to break the causal chain. *See United States v. Perez-Esparza,* 609 F.2d 1284, 1290 (9th Cir. 1980) (consent to search given within three hours after illegal detention was invalid).

¶32     Furthermore, there were no intervening events to break the chain between improper interrogation and consent, such as a subsequent release from custody, an appearance before a magistrate, discussions with a lawyer, or a subsequent conviction on unrelated charges. *See DeSales v. Woo,* 860 F. Supp. 1436, 1444 (N.D. Cal. 1994). After invoking his right to counsel, Davolt's interrogation continued for approximately forty-five minutes. Police then placed

-14-

Davolt in a cell, where, less than fifteen minutes later, officers approached him with the consent form to sign.

¶33    Finally, we note that the police misconduct was extreme. During the period of Davolt's arrest and initial interrogation, police twice violated *Miranda,* violated the Fifth Amendment by obtaining Davolt's involuntary statements and then, within a matter of minutes, approached Davolt requiring that he sign the written consent form on which they later relied to search the motel room. On these facts, we conclude that Davolt's consent was severely tainted by the prior Fifth Amendment violations and could not provide sufficient basis for police to search the room. *See State v. King,* 140 Ariz. 602, 604, 684 P.2d 174, 176 (1984) (consent to search obtained after *Edwards* violation could not serve to legitimize a warrantless search).

¶34    Thus, the search was presumptively illegal because it was conducted without a warrant, without exigent circumstances, and without valid consent.  As such, the search violated the Fourth Amendment of the United States Constitution and Article 2, section 8 of the Arizona Constitution, and the evidence obtained should therefore have been suppressed as fruit of the poisonous tree. *See Schneckloth,* 412 U.S. at 233 (search of home without a warrant or consent is unreasonable unless exigent circumstances exist); *State v. Bolt,* 142 Ariz. 260, 265, 689 P.2d 519, 524 (1984) (evidence seized as a result of a warrantless entry into a defendant's home

without the excuse of exigent circumstances is *per se* unlawful under the Arizona Constitution and should have been suppressed).

### 2. The Inevitable Discovery Doctrine

¶35    Illegally obtained physical evidence may be admitted if the State can demonstrate by a preponderance of the evidence that such evidence inevitably would have been discovered by lawful means. *Nix v. Williams,* 467 U.S. 431, 444 (1984); *State v. Lamb,* 116 Ariz. 134, 138, 568 P.2d 1032, 1036 (1977).  The trial court found that the State proved by a preponderance of the evidence that the location of Davolt's motel room inevitably would have been discovered without the initial illegal custodial interrogation.  We agree.  Davolt was arrested near the motel, there were only four motels in Beaumont, and the key had the room number "101" on it.

¶36    We disagree, however, with the trial court's further conclusion that the inevitable discovery doctrine cures the additional Fourth and Fifth Amendment violations.  The doctrine requires the State to prove, by a preponderance, that absent the initial illegality, the evidence would nonetheless have been discovered by *lawful means. Nix,* 467 U.S. at 444 (emphasis added).  Even assuming the police inevitably would have discovered the location of the motel room, no information was adduced that the evidence discovered in the room might ever have been obtained

-16-

lawfully.[2] No effort was made to obtain a search warrant, and we must reject the notion that the State relied on Davolt's tainted consent in good faith. The constitutional violations in this case are clear.

¶37 Arizona has adopted the broad view of the inevitable discovery rule. Under that view, the State is not required to demonstrate that police initiated lawful means to acquire evidence prior to its seizure. *See State v. Paxton,* 186 Ariz. 580, 586, 925 P.2d 721, 727 (App. 1996). However, we distinguish the instant case from a situation in which we assume the police would have complied with subsequent constitutional requirements after an initial illegality. Here, there is hard evidence they did not. The State cannot claim inevitable discovery and thereupon be excused from all constitutional requirements. Such a claim amounts to the unacceptable assertion that police would have done it right had they not done it wrong. The deterrence rationale of the exclusionary rule is especially important in this case in which constitutional violations occurred on three separate occasions,

---

[2] We note that the means by which the motel room evidence was obtained in this case cannot be characterized as lawful, even under a narrow interpretation of that term, because the means by which police actually discovered the evidence violated Davolt's personal rights. *Cf. United States v. Scott,* 270 F.3d 30, 45 (1st Cir. 2001) ("a means by which challenged evidence would inevitably have been discovered that itself violates the law is not, *by that violation alone*, unlawful as to a defendant if those means did not violate that defendant's personal rights").

-17-

that is, the two interrogations and the motel entry and search.[3]

¶38     Prior opinions of this court dealing with the inevitable discovery doctrine support today's ruling.  In each case, we have consistently allowed the introduction of evidence that inevitably would have been *lawfully* discovered, absent initial illegality. *See Castaneda,* 150 Ariz. at 388, 724 P.2d at 7 (although defendant was coerced into telling police where the body was, the evidence was admissible because the body inevitably would have been discovered as soon as it became light); *Lamb,* 116 Ariz. at 138, 568 P.2d at 1036 (evidence obtained during an illegal pat down search was admissible because defendant would have been arrested on independent grounds and the evidence would inevitably have been discovered during a lawful search incident to that arrest).  But we have never applied the inevitable discovery doctrine to cure multiple constitutional violations and decline to do so here.

### 3.  Harmless Error

¶39     We assess a trial court's erroneous denial of a motion to

---

[3]     On appeal, Davolt argued that the inevitable discovery doctrine cannot be applied to cure the taint of evidence illegally seized from his motel room based on *State v. Ault,* 150 Ariz. 459, 466, 724 P.2d 545, 552 (1986).  In *Ault,* we held the inevitable discovery doctrine will not cure the taint of evidence obtained in the illegal search of a person's home based on the heightened protection afforded a home by Article 2, section 8 of the Arizona Constitution.  Because we find that the State failed to demonstrate by a preponderance of the evidence that inevitably it would have obtained the motel room evidence by lawful means, we need not reach the question whether a motel room would receive the same degree of protection accorded a home by the Arizona Constitution.

suppress for harmless error. *Castenada,* 150 Ariz. at 387, 724 P.2d at 6. Error is harmless if the reviewing court can say beyond a reasonable doubt that the error did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 24 (1967); *State v. Ashelman,* 137 Ariz. 460, 466, 671 P.2d 901, 907 (1983).

¶**40** Probative evidence obtained from the motel room was largely cumulative. Some items were without significant probative value, for example, the Marlboro cigarettes,[4] Davolt's Mohave County Library Card, and a remote control toy car. Incriminating items included a crossword puzzle book that belonged to the victims; a roll of red duct tape that appeared to match duct tape found on the telephone cord at the victims' residence; two medallions with numbers on the reverse sides that matched telephone numbers dialed from the victims' residence at approximately 3:00 a.m. Wednesday, November 25, 1998; a Green Bay Packers' shirt and jacket; and clothing belonging to N.Z.

¶**41** The significance of these items, however, is diminished by other evidence. Davolt had been reported missing on the Monday before the victims were discovered, after he failed to appear at school. A workman had seen him talking to N.Z. on Pueblo Drive that Monday morning between 9:00 and 11:00 a.m. On Tuesday

---

[4] Although Marlboro cigarettes were found in an ashtray in the victims' living room, DNA evidence directly linked Davolt to those partially smoked cigarettes.

-19-

morning, Bank One security cameras captured Davolt attempting to withdraw money from the victims' bank account from the drive-up and walk-up ATM machines. An hour later, Bank One security cameras captured Davolt inside the bank cashing a $1,500 check written by E.Z. He was wearing a Green Bay Packers shirt. Davolt's mother informed police that her son did not own any Packers attire, but E.Z.'s son testified that N.Z. was an "extreme" Packers fan. The thumbprint given the bank teller to cash the check positively identified Davolt as the person who cashed the check.

¶42 On Wednesday, the mail carrier saw water running out of the garage just before noon, suggesting that the fire had already occurred. N.Z. and E.Z. were discovered dead in their kitchen Thursday morning, victims of a violent double homicide. The house had been set on fire and Davolt's fingerprints were found on the camp fuel can in the garage, the mop handle with a square sponge head that matched the outline of mop strokes in the blood on the floor of the garage, the wine box found on a table in the living room, and the ceramic bowl used as a makeshift ashtray found in the living room. Davolt's DNA was found on 10 to 15 Marlboro cigarettes inside the makeshift ashtray in the victims' home.

¶43 On Sunday, Davolt was found in possession of the victims' vehicle in California. The vehicle contained Marlboro cigarettes, a bank card and insurance papers belonging to the victims, and Davolt's disassembled green mountain bike. Medical experts agreed

that E.Z. died between Tuesday and Wednesday night and that N.Z. predeceased E.Z. by at least twenty-four to forty-eight hours. Although the properly admitted evidence was circumstantial, its probative weight was substantial, easily sufficient to justify the verdicts of the jury. Thus, even without evidence that should have been excluded, the verdicts would not have been different. Upon review of the entire record, we conclude, as a matter of law, that the introduction of the illegally seized motel room evidence was harmless beyond a reasonable doubt.

**B.    Change of Venue**

¶44    Davolt argues the trial court erred by denying his motion for change of venue. We review the denial of all such motions for abuse of discretion and resulting prejudice to the defendant. *State v. Salazar,* 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992).

¶45    A criminal defendant is entitled to a change of venue if there is a probability the dissemination of prejudicial information will deprive the defendant of a fair and impartial trial. Ariz. R. Crim. P. 10.3(b). We determine whether "under the totality of the circumstances the publicity attendant to defendant's trial was so pervasive that it caused the proceeding to be fundamentally unfair." *State v. Atwood,* 171 Ariz. 576, 630, 832 P.2d 593, 647 (1992) (citing *Murphy v. Florida,* 421 U.S. 794, 799 (1975)), *overruled on other grounds by State v. Nordstrom,* 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2000). Prejudice may be presumed or

-21-

actual. *State v. Blakley,* 204 Ariz. 429, ___ ¶¶ 14-16, 65 P.3d 77, 82 (2003).

### 1. Presumed Prejudice

**¶46** Prejudice may be presumed if the publicity "was so extensive or outrageous that it permeated the proceeding or created a 'carnival-like atmosphere.'" *Atwood,* 171 Ariz. at 631, 832 P.2d at 648. The adverse publicity must be so extensively pervasive and prejudicial that "the court cannot give credibility to the jurors' attestations, during voir dire, that they could decide fairly." *Nordstrom,* 200 Ariz. at 239, ¶ 15, 25 P.3d at 727. This is a high standard and it is rarely met. We have refused to presume prejudice when the publicity was "primarily factual and non-inflammatory or if the publicity did not occur close in time to the trial." *Id.* (citing *State v. Jones,* 197 Ariz. 290, 307 ¶ 44, 4 P.3d 345, 362 (2001); *State v. Bible,* 175 Ariz. 549, 563-64, 858 P.2d 1152, 1166-67 (1993); *State v. Bedford,* 157 Ariz. 37, 39, 754 P.2d 1141, 1143 (1988)); *see also Blakley,* 204 Ariz. at ___, ¶ 15, 65 P.3d at 82.

**¶47** Our review indicates that media coverage of the trial was not particularly pervasive, inflammatory, or prejudicial. Davolt produced twenty newspaper articles and thirteen radio reports that were published or broadcast about the case in Lake Havasu, Kingman, and Mohave Valley, Arizona, during the period from November 1998 through December 1999. The majority of these news accounts were

-22-

generated at the time of the crime and were factual in nature.

¶48　　　The only potentially troublesome coverage included one newspaper article that mentioned Davolt had previously run away from home, and two radio reports and a newspaper article that mentioned a possible connection between Davolt and another double homicide in California.  However, these accounts expressly stated any connection to the California murders was unproven and tenuous.  Moreover, they were published in December 1998, more than fifteen months before the trial.  Accordingly, we cannot presume prejudice from this record because news coverage of the crimes did not reach a point at which it might have significantly affected the fairness of the proceedings or the atmosphere surrounding the trial.

## 2.　Actual Prejudice

¶49　　　In the absence of presumed prejudice, the defendant must demonstrate that the pretrial publicity was actually prejudicial and likely deprived him of a fair trial.  *State v. Chaney,* 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984).  To establish actual prejudice, the defendant must show that "the jurors have formed preconceived notions concerning the defendant's guilt and that they cannot leave those notions aside."  *Id.*

¶50　　　Davolt first claims actual prejudice is established because nine of the fourteen empaneled jurors, including two alternates, had some prior knowledge of the case.  We disagree.  Prior knowledge of the case alone is insufficient to disqualify a

juror.  *See State v. Smith,* 123 Ariz. 231, 236, 599 P.2d 187, 192 (1979) (citing *Murphy,* 421 U.S. 794).  The critical inquiry is the "*effect* of publicity on a juror's objectivity."  *State v. LaGrand,* 153 Ariz. 21, 34, 734 P.2d 563, 576 (1987).  The record indicates that the trial court struck all prospective jurors who stated they had formed preconceived notions about the case or did not believe they could be fair and impartial.  Furthermore, all members of the final jury pool affirmed they could be fair and impartial.

¶51    We also reject Davolt's claim that the voir dire examination was inadequate to discern actual prejudice of the prospective jurors.  The trial court questioned each prospective juror about his or her exposure to pretrial publicity, including the extent of knowledge, the point at which this knowledge was obtained, the source, and finally, whether the prospective juror could be fair and impartial.  All prospective jurors who indicated they could not be fair and impartial were struck for cause by the trial court.  The trial court then conducted private, individual questioning of each prospective juror who had been exposed to pretrial publicity and ascertained the extent of each prospective juror's knowledge of the case.  The prospective jurors' answers revealed that most had little more, if any, than a vague recollection of the primary facts of the crime.  Counsel for both sides were present and were given the opportunity to ask questions. Finally, the court again queried whether the prospective jurors

would find it difficult to be fair and impartial. All prospective jurors who stated they could not be fair or impartial were excused. Only those who stated affirmatively they could be fair and impartial remained. This procedure was adequate to discern bias or prejudice on the part of prospective jurors. On the record before us, we conclude the trial court did not abuse its discretion in denying the motion for a change of venue.

## II. TRIAL ISSUES

## A. Refusal to Submit Jury Questionnaire

¶52 Davolt claims the trial court erred in denying his request to submit a questionnaire to the jury. We disagree. A trial court's decision concerning voir dire will not be overturned absent a clear abuse of the judge's discretion. *Chaney,* 141 Ariz. at 304, 686 P.2d at 1274. Rule 18.5 of the Arizona Rules of Criminal Procedure requires a thorough examination of potential jurors and allows parties reasonable time to conduct further oral examination upon request. While the rule allows the use of written jury questionnaires, it does not require it. *See State v. Cañez,* 202 Ariz. 133, 148, ¶ 37, 42 P.3d 564, 579 (2002). Furthermore, we note that the trial judge did not restrict counsel from asking questions and afforded counsel ample opportunity individually to question any prospective juror. We find no abuse of discretion. The voir dire examination was adequate to assure Davolt's right to a fair and impartial jury.

## B.   Juror Misconduct

¶53     Davolt alleges three incidents of juror misconduct. First, he alleges that defense counsel notified the trial court that he had overheard a male juror state he spent the lunch break reading the newspaper.  Second, he claims defense counsel informed the court the next day that he had seen juror number 14 "carrying around a newspaper that morning."  Third, he alleges the court clerk informed the court that she had seen a male juror carrying a Las Vegas newspaper during the trial.

¶54     Further, Davolt argues that the trial court erred by not investigating these incidents and this failure violated various rights, including the right to an impartial jury, to confrontation of witnesses, to due process, and to freedom from cruel and unusual punishment, any of which could require a new trial.  We disagree for the following reasons.

¶55     Davolt first claims the trial court failed in its affirmative duty to investigate the alleged incidents of juror misconduct, citing *Silverthorne v. United States,* 400 F.2d 627, 643 (9th Cir. 1968).  Davolt's reliance on *Silverthorne* is misplaced. In *Silverthorne,* the trial court was aware that several prejudicial articles about the defendant's case had appeared in local newspapers during the trial.  *Id.* at 644.  The Ninth Circuit held this fact, in combination with allegations that jurors had been reading newspapers during the trial, was sufficient to trigger the

trial court's duty to investigate the matter further. *Id.* The court noted: "Jurors are not presumed to separate the truth from the falsity in newspaper articles *concerning the trial* in which they sit as judges of fact." *Id.* at 643 (emphasis added).

¶56 We review a trial court's decision to investigate allegations of juror misconduct for abuse of discretion. *State v. Miller,* 178 Ariz. 555, 556, 875 P.2d 788, 789 (1994). A trial court's duty to investigate alleged incidents of juror misconduct arises only if there is an allegation that the newspaper articles related to a material fact or law at issue in the case. *United States v. Caro-Quintero,* 769 F. Supp. 1564, 1575 (C.D. Cal. 1991) ("[T]he mere fact that local newspapers were in the jury room does not amount to extraneous influences on the jury . . . ; [the newspapers] cannot even be characterized as extrinsic evidence."); *see also United States v. Thompson,* 908 F.2d 648, 652 (10th Cir. 1990) (the trial court had a duty to investigate alleged incidents of juror misconduct where there was evidence that prejudicial articles had appeared in the local newspaper and the jury was not sequestered, even though no specific allegations were made that jurors had been reading the paper).

¶57 The record before us is devoid of any allegation or evidence that any of the newspapers allegedly read or carried by jurors contained articles *concerning the trial,* or that articles about the trial had been published in any of the local newspapers.

-27-

For this reason, Davolt's bare allegations of juror misconduct are insufficient to trigger the trial court's duty to investigate the matter further.  We find no violation of the duty to investigate.

¶58       Similarly, these allegations are insufficient to trigger the need for a new trial.  Juror misconduct warrants a new trial only if "the defense shows actual prejudice or if *prejudice may be fairly presumed from the facts.*"  *Miller,* 178 Ariz. at 558, 875 P.2d at 794 (citing *State v. Vasquez,* 130 Ariz. 103, 105, 634 P.2d 391, 393 (1981)).  In a criminal case, prejudice may be presumed from "any private communication, contact or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury."  *Remmer v. United States,* 347 U.S. 227, 229 (1954).  "Once the defendant shows that the jury has received and considered extrinsic evidence, prejudice must be presumed and a new trial granted unless the prosecutor proves beyond a reasonable doubt that the extrinsic evidence did not taint the verdict."  *State v. Hall,* 204 Ariz. 442, ___, ¶ 16, 65 P.3d 90, 95 (2003) (citing *Miller,* 178 Ariz. at 558-60, 875 P.2d at 791-93).

¶59       As discussed, there was no allegation that newspapers contained even a remote statement concerning issues pending before the jury.  Prejudice cannot be presumed without the requisite showing that the jury received and considered extrinsic evidence on the issues.  Moreover, Davolt has shown no actual prejudice.  He is

not entitled to a new trial because there is no evidence indicating juror misconduct.

## C. Admission of Photographs and Videotape

¶60 Davolt contends the trial court erred in admitting photographs of the crime scene and autopsies as well as a video of the crime scene. The admission of evidence is within the trial court's discretion and will not be disturbed absent an abuse of discretion. *State v. Gulbrandson,* 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995). We assess the admissibility of photographs under a three-part test, examining 1) relevance, 2) tendency to incite or inflame, and 3) the probative value versus the potential to cause unfair prejudice. *State v. Spreitz,* 190 Ariz. 129, 141, 945 P.2d 1260, 1272 (1997).

¶61 Davolt contends that the crime scene photos and videotape and the autopsy photos were not relevant because the identity and extent of the victims' injuries was uncontested. We do not agree. The State has the burden of proving every element of first degree murder. *State v. Bocharski,* 200 Ariz. 50, 55-56, ¶ 22, 22 P.3d 43, 48-49 (2001). Evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Ariz. R. Evid. 401. The fact and cause of death are always relevant in a murder case. *State v. Harding,* 141 Ariz. 492, 499, 687 P.2d 1247, 1254 (1984).

¶62    The autopsy photos depicted close-up images of the victims' decomposed bodies and N.Z.'s head with the scalp pulled back to reveal the skull. The State claims these photos were offered to show the differing degree of decomposition between the two bodies and to show that N.Z. survived following the blunt force wounds to his head.  We agree that although these photos display extreme violence, they were relevant to the time and manner of the victims' deaths and therefore probative of disputed facts of consequence in the case.  We cannot say that the trial court abused its discretion in permitting their introduction.

¶63    However, we find that the trial court abused its discretion in admitting crime scene photographs and videotape.  The probative value of relevant evidence is minimal when the defendant does not contest a fact that is of consequence.  *Bocharski,* 200 Ariz. at 56, ¶ 23, 22 P.3d at 49.   In such a circumstance, "gruesome photographs may have 'little use or purpose except to inflame,' and their prejudicial effect can be significant." *Id.* (quoting *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983)).  Davolt did not contest the identity of the victims or the fact that the murders occurred.  Accordingly, photographs and videotape of the crime scene were of minimal probative value, and they were highly inflammatory.  They depicted the scene of the victims' charred bodies in the kitchen.  Several of the photos were wholly cumulative and were not offered to complement additional

testimony.  We believe the minimal probative value of these visuals was substantially outweighed by the risk of undue prejudice and that the trial court abused its discretion in admitting them.

¶64    We assess the erroneous admission of evidence for harmless error.  *State v. Fulminante,* 161 Ariz. 237, 245, 778 P.2d 602, 610 (1988).  Error is harmless if we can conclude, beyond a reasonable doubt, that the error did not contribute to or affect the jury's verdict.  *Bible,* 175 Ariz. at 588, 858 P.2d at 1191.  As discussed, evidence, properly admitted, connecting Davolt to these crimes was overwhelming.  We therefore conclude beyond a reasonable doubt that the erroneously admitted crime scene photographs and videotape did not contribute to the verdict.  Nevertheless, we caution prosecutors once again to refrain from jeopardizing criminal convictions by introducing inflammatory material.  *See Bocharski,* 200 Ariz. at 56, ¶ 25, 22 P.3d at 49.  Davolt's trial is preserved from reversible error solely by the strength of the remaining evidence against him.  In this particular case, the error was harmless.

## D.    Preclusion of Evidence

¶65    Davolt contends that the trial court erred by precluding testimony about Detective Harry's incompetence in recording coerced inculpatory statements Davolt made while in custody in California. He asserts that the preclusion of this testimony "gutted his defense" because it was probative of police sloppiness -- his

-31-

primary defense.

¶66    As noted, we review the trial court's exclusion of evidence for an abuse of discretion. *State v. Macumber,* 119 Ariz. 516, 521, 582 P.2d 162, 167 (1978).  The trial court reasoned that testimony concerning Detective Harry's improper recording and subsequent erasure of a portion of a tape recording of Davolt's coerced inculpatory statements that were suppressed was not relevant to issues in dispute.  We agree and thus find no abuse of discretion.

**E.    DNA Evidence**

¶67    Davolt claims the trial court erroneously denied his motion *in limine* and admitted DNA evidence at trial.  The motion *in limine*, filed just days before trial, was based on the assertion that the DNA evidence could not be admitted because random match statistics are not generally accepted under *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).  We disagree and find no error in the denial of the motion.

¶68    When scientific evidence has been found to meet the *Frye* standard, a *Frye* inquiry is necessary "only when the opposing party makes a timely request for such an inquiry supported by authorities indicating there may not be general scientific acceptance of the technique." *State v. Harris,* 152 Ariz. 150, 152, 730 P.2d 859, 861 (App. 1986).  We have held that DNA evidence based on the product rule method of calculating the probability of a match is acceptable

when the database satisfies *Frye* requirements. *State v. Hummert,* 188 Ariz. 119, 123, 933 P.2d 1187, 1191 (1997); *see also State v. Marshall,* 193 Ariz. 547, 551, 975 P.2d 137, 141 (App. 1998). Davolt's motion was not supported by credible authority that product rule evidence is generally unacceptable. The motion was thus properly denied on the merits. We also note the motion was submitted too late to meet reasonable timeliness standards. *See* Ariz. R. Crim. P. 16.1(b) (all motions to be submitted at least twenty days before trial).

## F.  Expert Testimony

¶69     Davolt contends that the trial court erroneously admitted testimony of several witnesses not properly qualified to testify as experts. We review the trial court's admission of expert testimony for an abuse of discretion. *State v. Hyde,* 186 Ariz. 252, 276, 921 P.2d 655, 679 (1996). We find no error.

¶70     Rule 702 of the Arizona Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The test of whether a person is an expert is whether a jury can receive help on a particular subject from the witness. *Bliss v. Treece*, 134 Ariz. 516, 518-19, 658 P.2d 169, 172-73 (1983). The degree of qualification goes to the weight

given the testimony, not its admissibility. *State v. Mosley,* 119 Ariz. 393, 400, 581 P.2d 238, 245 (1978).

### 1. Colleen Proffitt

¶71 Davolt first argues that the State's expert, Colleen Proffitt, was not qualified to testify as an expert in DNA analysis and therefore the trial court erred in admitting her testimony that the chance the saliva found on cigarette remains in the house did not belong to Davolt was one in 280 quadrillion for the Caucasian population. The argument is flawed.

¶72 Proffitt has been involved with DNA testing since 1986 and has extensive training and experience in the field. She testified that DNA testing requires the use of population databases to calculate random match statistics and that she regularly accessed population databases as a DNA analyst. Her testimony was based on random match statistical evidence, which this court has found to be admissible. *Johnson,* 186 Ariz. at 335, 922 P.2d at 300. Proffitt was clearly more qualified and had more knowledge in the specific area of DNA than an ordinary juror, and her testimony assisted the jury in its consideration of the evidence. The trial court did not abuse its discretion in admitting her testimony.

### 2. Detective Harry

¶73 Davolt contends Detective Harry was not qualified to testify as an expert in blood splatter analysis and therefore the trial court erred in allowing his testimony about blood splatter

-34-

found on the floor of the garage.

¶74 Detective Harry testified that "there appeared to be spots of blood around the perimeter -- inside the perimeter of the garage, and it was in such a fashion as to suggest that somebody had walked around something there. Presumably, walked around a car in the garage."

¶75 Detective Harry's training in blood splatter analysis consisted of attending classes on crime scene management, a class on homicide investigation, and watching two training videos on blood splatter analysis as part of his advanced officer training at the Lake Havasu Police Department. While this training is not extensive, it is significantly more extensive than the average person has received and is sufficient to allow the testimony to be heard by the jury.

¶76 Davolt claims further that the trial court erroneously admitted testimony by Detective Harry that N.Z. was killed before E.Z. However, Davolt's citations to the record do not demonstrate that Detective Harry testified to that effect. Therefore, we reject this claim.

### 3. John Hoang

¶77 Davolt argues that John Hoang was not qualified to testify as an expert on ignitable liquids and that the trial court erred by admitting his testimony that clothing samples obtained from the victims at the crime scene showed a residue consistent

with the light petroleum distillate class of ignitable liquids, which includes lighter fluid and camp fuel.  We disagree.

¶78      Hoang's qualifications include a Bachelor of Science degree in forensic science with a minor in chemistry from California State University at Sacramento, two years of work as a criminalist with the Arizona Department of Public Safety analyzing ignitable liquids, training from experienced criminalists in the field of ignitable liquids, work on more than fifty cases, analysis of more than 100 ignitable liquid samples, and a forty-hour class taught by the FBI on the laboratory analysis of fire debris.  We find this to be sufficient training.  A person can be qualified as an expert based on his or her training or experience.  *See* Ariz. R. Evid. 702.  The trial court did not abuse its discretion in admitting Hoang's testimony.

### 4.  Allison Sedowski

¶79      Finally, Davolt argues that Allison Sedowski was not qualified to testify concerning blood sample analysis because  she had been to only one prior crime scene.  We find this assertion unsupported by the record.  Sedowski is a blood analyst, not a collector of blood evidence. There is no indication that Sedowski was involved in the collection of blood  at the scene. Furthermore, our review of the record indicates that Sedowski was fully qualified to testify concerning the results of her blood sample analysis.

-36-

¶80　　　At the time of the trial, Sedowski had been employed as a serologist in the DNA unit of the Arizona Department of Public Safety Crime Lab for one and one-half years.  She received a Bachelor's degree in chemistry from Northern Arizona University and had taken post-graduate classes in genetics and population statistics.  She had performed blood analysis tests thousands of times and had worked on more than 100 cases.  The trial court did not err in admitting her testimony.

**G.　Third-Party Defense**

¶81　　　Davolt contends the trial court erred by precluding the admission of evidence the crimes were committed by a third party.  Once again, we disagree.

¶82　　　Third-party evidence depends on relevance and the effect the evidence has on the defendant's culpability.  *State v. Gibson,* 202 Ariz. 321, 324, ¶ 16, 44 P.3d 1001, 1004 (2002).  Third-party evidence is relevant if it "tend[s] to create a reasonable doubt as to the defendant's guilt."  *Id.*

¶83　　　Davolt's proffered evidence of third-party culpability was that N.Z. was unpopular.  The trial court found this assertion "not relevant under any circumstance."  This finding complies with the standard we announced in *Gibson*.  Furthermore, we note the trial court did not preclude Davolt from arguing generally that some unknown person committed the murders.  The trial court did not abuse its discretion in precluding this evidence.

## H.   Trial Security Measures

¶84      Davolt asserts that the presence of uniformed jail personnel and the requirement that he wear a leg brace during the trial deprived him of a fair trial.  Matters of courtroom security are left to the discretion of the trial court.  *See State v. Boag,* 104 Ariz. 362, 366, 453 P.2d 508, 512 (1969) ("[A]bsent incontrovertible evidence of hurt, the trial court should be permitted to use such means to secure the named ends.") (citations omitted).  We will uphold a trial court's decision concerning trial security measures when the decision is supported by the record. *State v. McKinney,* 185 Ariz. 567, 576, 917 P.2d 1214, 1223 (1996).


¶85      The trial court specifically noted that Davolt had attempted to escape from the Mohave County jail while awaiting trial.  In view of the trial court's well founded security concern and the absence of evidence of specific prejudice to Davolt, we cannot say the trial court abused its discretion.

## I.   Motion for Judgment of Acquittal

¶86      Davolt argues the that trial court erred in denying his Rule 20 motion for a judgment of acquittal because no adequate evidence supported felony murder or premeditation.   Davolt is clearly wrong.

¶87      A judgment of acquittal shall be entered if no substantial evidence supports the conviction.  *See* Ariz. R. Crim.

-38-

P. 20.  Substantial evidence is that which reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt.  *Id.* "If reasonable [persons] may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *State v. Rodriguez,* 186 Ariz. 240, 245, 921 P.2d 643, 648 (1996).  In determining the sufficiency of the evidence, we view the evidence in the light most favorable to sustaining the verdict, and we resolve all inferences against the defendant.  *State v. Spears,* 184 Ariz. 277, 290, 908 P.2d 1062, 1075 (1996).

¶88    Substantial evidence was presented to support the theory of felony murder based on the predicate offense of burglary.  Here the evidence clearly established either the offense of unlawful entry or remaining unlawfully with the intent to commit theft.  Evidence was also clear that in the course of committing the prohibited entry and in furtherance of committing the burglary he murdered the two victims.

¶89    On Thursday morning, N.Z. and E.Z. were discovered dead in their kitchen, the victims of a violent double homicide.  Their house had sustained a fire and their car was missing.  Wednesday just before noon, the mail carrier noted water running from under the garage door and down the driveway, indicating the fire had already occurred.  Tuesday morning, Bank One video cameras captured Davolt, wearing Green Bay Packers attire, attempting to withdraw

money from the victims' bank account at several different ATM machines and, inside the bank, cashing a $1,500 check, written by E.Z.  Monday morning, a workman saw Davolt speaking with N.Z. on Pueblo Drive several times over a two hour period.  The man overheard N.Z. ask Davolt where he lived, suggesting they had not known each other previously.  DNA and fingerprint evidence placed Davolt inside the victims' home.  Davolt had been reported missing since the Monday before the victims' bodies were discovered dead, after he failed to show up for school.  The following Sunday, Davolt was found in California, in possession of the victims' car and various items that were in the car.  The trial court did not err in denying Davolt's Rule 20 motion on the felony murder charge based on burglary.

¶90    In addition, substantial evidence supported the State's premeditation theory.  The State proved that N.Z. had been attacked with a hatchet, probably in the garage.  Medical experts agreed that N.Z. survived the initial attack but was subsequently shot three times resulting in his death, probably  inside the home. Medical experts further agreed that E.Z. was strangled with bare hands and that it would have taken several minutes for her to die, and that N.Z. predeceased E.Z. by a significant period.  Clearly, there is sufficient evidence to support a premeditation verdict in either killing.  The trial court did not err in denying the motion for a judgment of acquittal.

## J. Failure to Instruct on Second Degree Murder

¶91    Davolt argues the trial court abused its discretion by refusing to instruct the jury on second degree murder.  In *Beck v. Alabama,* the Supreme Court held

> where the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense -- but leaves some doubt with respect to an element that would justify conviction on a capital offense -- the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

447 U.S. 625, 637 (1980).  However, *Beck* does not require a trial court to instruct on a lesser included offense that is unsupported by the evidence.  *See Schad v. Arizona,* 501 U.S. 624, 648 (1991); *State v. Landrigan,* 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993).

¶92    First, there is no lesser included offense to felony murder.  *State v. Arias,* 131 Ariz. 441, 443-44, 641 P.2d 1285, 1287-88 (1982).  Second, there is little or no evidence in this record to support a second degree murder charge.  The defense theory of the case was that Davolt did not commit the murders.  The circumstances of these murders provide a clear signal that premeditation played a key role.  The trial court did not err in refusing to instruct on second degree murder.

## K. Coercion of the First Degree Murder Verdict

¶93    Davolt argues that the trial court coerced the jury's first degree murder verdicts because the court sent the jury back on three separate occasions to make changes to the verdict forms

after the jury first returned with its verdict. Again, we disagree.

¶94    Jury coercion exists when "the trial court's actions or remarks, viewed in the totality of the circumstances, displaced the independent judgment of the jurors," *State v. McCrimmon,* 187 Ariz. 169, 172, 927 P.2d 1298, 1301 (1996) (quoting *State v. McCutcheon,* 150 Ariz. 317, 319-20, 723 P.2d 666, 668-69 (1986)), or when the trial judge encourages a deadlocked jury to reach a verdict, *McCutcheon*, 150 Ariz. at 320, 723 P.2d at 669.

¶95    Our review of the record indicates no suggestion of jury coercion. When questioned by the judge, the jury foreperson indicated on two occasions that the verdict forms completed by the jury did not reflect the jury's verdict because the jurors had not understood how to fill out the forms. However, when the jury returned its final verdict, the court polled each juror individually, and each affirmed this was his or her verdict. There is no evidence that the court's independent judgment displaced the judgment of the jurors. Nor is there any evidence the jury was ever deadlocked. Davolt's claim of jury coercion is without merit.

### III. ISSUES WAIVED

¶96    Davolt has raised several issues that were not raised in

the trial court.[5]  None presents an issue of fundamental error. Fundamental error is "error of such dimension that it cannot be said it is possible for a defendant to have a fair trial."  *State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991).  We have carefully reviewed these issues and conclude the arguments are either 1) without factual support, 2) present no error, or 3) constitute matters in which the error, even if it occurred, was harmless.  As none presents an issue of fundamental error, we do not discuss any of them further.  *See State v. Bolton*, 182 Ariz. 290, 297-98, 896 P.2d 830, 837-38 (1995).

## IV. SENTENCING ISSUES

### A.  Automatic Filing Statute

¶97      Finally, we address Davolt's claim that the tandem death penalties imposed in this case under the procedure mandated by Arizona's Automatic Filing Statute, A.R.S. § 13-501 (2001), violate the Eighth Amendment's prohibition against cruel and unusual punishment.  The statute provides:

> The county attorney *shall* bring a criminal prosecution against a juvenile in the same manner as an adult if the juvenile is fifteen, sixteen or seventeen years of age and is accused of any of the following offenses: 1) First degree murder in violation of § 13-1105 . . . .

A.R.S. § 13-501(A)(1) (emphasis added).

---

[5]      The issues include adequacy of voir dire, propriety of reasonable doubt instruction, alleged instances of prosecutorial misconduct, and admissibility of testimony regarding fire, fingerprint, and other evidence.

¶98    Under Arizona law, first degree murder is a class 1 felony that is punishable by death or life imprisonment. *See* A.R.S. § 13-1105(C). Arizona's capital sentencing statute requires that the death sentence shall be imposed if one or more aggravating circumstances are found and there are no mitigating circumstances sufficiently substantial to call for leniency. *See* A.R.S. § 13-703 (Supp. 2002).[6]    Thus, as a consequence of Arizona's Automatic Filing Statute, a sixteen- or seventeen-year-old juvenile charged with first degree murder is automatically tried as an adult for the offense of first degree murder which could be punishable by death if the state determines, in its discretion, to seek the death penalty.[7]

¶99    Davolt argues the death penalties imposed in this case

---

[6]    At the time of Davolt's trial, Arizona's capital sentencing statute required that a judge determine the existence of aggravating and mitigating factors and decide whether the mitigating factors were sufficiently substantial to call for leniency. *See* former A.R.S. § 13-703 (2000). The Supreme Court subsequently held that statute unconstitutional in *Ring v. Arizona,* 536 U.S. 584, 609 (2002) *(Ring II).* The decision resulted in Arizona's new sentencing statute, A.R.S. § 13-703 (Supp. 2002). Irrespective of the *Ring* issue, we note that neither the former nor the current statute would alter the impact on Davolt, i.e., a juvenile defendant charged with first degree murder under either version would nevertheless be automatically subject to trial as an adult for capital murder.

[7]    Although fifteen-year-old juveniles who commit first degree murder must be charged as adults under Arizona's automatic filing statute, A.R.S. § 13-501(A)(1), they are ineligible to receive the death penalty because of the Supreme Court's holding in *Thompson v. Oklahoma*, 487 U.S. 815 (1988), that it would offend the Eighth Amendment to impose such a sentence on a fifteen-year-old.

pursuant to the procedure set forth in § 13-501 violate the Eighth Amendment's prohibition against cruel and unusual punishment because the statute fails to provide for individualized consideration of a juvenile defendant's maturity and moral responsibility before subjecting the juvenile to trial as an adult for capital murder.[8] We review the validity of a statute *de novo* and construe it, whenever possible, to uphold its constitutionality. *In re Leon G.,* 204 Ariz. 15, 19, ¶ 9, 59 P.3d 779, 783 (2002).

¶100 In 1996, the voters of Arizona passed Proposition 102, the Juvenile Justice Initiative, which amended our state constitution to provide the legislature, or the people by referendum, with the authority to enact substantive and procedural laws regarding all proceedings and matters affecting juveniles. *See* Ariz. Const. art. 4, § 22. The amendment mandates that certain

---

[8] Davolt is the first juvenile defendant to make an Eighth Amendment challenge to A.R.S. § 13-501 in this court. Although we have previously upheld the imposition of the death penalty against defendants who were sixteen and seventeen years old at the time their crimes were committed, no such case involved the filing of a capital murder charge against a juvenile defendant in adult court under the automatic filing statute. *See State v. Jackson,* 186 Ariz. 20, 24, 918 P.2d 1038, 1042 (1996); *State v. Laird,* 186 Ariz. 203, 207, 920 P.2d 769, 773 (1996); *State v. Soto-Fong,* 187 Ariz. 186, 191, 928 P.2d 610, 615 (1996). The trials in each of these cases occurred before Proposition 102 was adopted and Article 4, section 22 of the Arizona Constitution was enacted. *See infra* ¶ 100. The defendants in each of the cited cases received a transfer hearing in which the juvenile court made an individualized assessment of whether the defendants should stand trial as adults.

juveniles aged 15 or older be automatically prosecuted as adults and be subject to the same laws as adults, except as provided by statutory exception. *Id.* The stated intent of Proposition 102 was to make possible more effective and more severe responses to juvenile crime. *See In re Cameron T.,* 190 Ariz. 456, 459, 949 P.2d 545, 548 (App. 1997). The effect of the amendment was to divest the juvenile courts of jurisdiction over certain juvenile offenders, including those charged with murder. *Id.* at 461, 949 P.2d at 550. In 1997, the Arizona legislature enacted A.R.S. § 13-501 to implement the provisions of Article 4, section 22 of the Arizona Constitution.

¶101    The State is clearly vested with the authority to define crimes, fix punishments, and establish procedure for criminal trials. *Payne v. Tennessee,* 501 U.S. 808, 824 (1991). However, state laws, including state constitutional provisions, are subject to the overriding authority of the United States Constitution, which imposes special limitations when a state imposes the death penalty for a crime. *Id.*

¶102    The Eighth Amendment prohibits punishments that are cruel and unusual. U.S. Const. amend. VIII. In death penalty jurisprudence, the amendment prohibits punishment that is excessive -- that is, disproportionate to the crime. *Atkins v. Virginia,* 536 U.S. 304, 311 (2002). There is a threshold below which the death penalty cannot be imposed. *Payne,* 501 U.S. at 824. A societal

-46-

consensus that the death penalty is disproportionate to a particular offense prevents a state from imposing the death penalty for that offense. *Id.; see also Atkins,* 536 U.S. at 316 (holding the Eighth Amendment poses a constitutional bar to the execution of mentally retarded persons). In the absence of such consensus, the "proportionality analysis requires that we compare the 'gravity of the offense,' understood to include not only the injury caused, but also the defendant's culpability, with the harshness of the penalty." *Stanford v. Kentucky,* 492 U.S. 361, 393 (1989) (plurality) (citing *Solem v. Helm,* 463 U.S. 277, 292 (1983)).

¶103    The assessment of a defendant's culpability is especially important in the context of the imposition of the death penalty on juveniles. The Supreme Court has recognized that juvenile offenders have lower levels of maturity and culpability than adults. *Eddings v. Oklahoma,* 455 U.S. 104, 116 (1982) (even a normal 16-year-old lacks the maturity of an adult); *Thompson v. Oklahoma,* 487 U.S. 815, 834 (1988) ("adolescents as a class are less mature and responsible than adults").

¶104    Nevertheless, in *Stanford v. Kentucky,* the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment did not erect a *per se* bar to the execution of juveniles at age sixteen or seventeen years at the time of their crimes primarily because no national consensus then existed against the execution of such defendants. 492 U.S. at 380. In upholding

-47-

death sentences imposed under the Missouri and Kentucky juvenile death penalty statutes, the Court emphasized that these states provided the individualized consideration that is constitutionally required in the "realm of capital punishment." *Id.* at 375 (citing *Lockett v. Ohio,* 438 U.S. 586, 605 (1978) (individualized consideration is a constitutional requirement in imposing the death sentence)).

¶105    The Court reasoned that the constitutionality of the imposition of the death penalty on a juvenile depends not on general state laws defining ages of legal disability, but on individualized consideration applied to the circumstances of each juvenile defendant. *See Stanford,* 492 U.S. at 375.  The Court noted that the statutory schemes at issue in *Stanford* satisfied the constitutional mandate for individualized consideration  because 1) both schemes specifically designated age as a statutory mitigating factor *and* 2) both required a juvenile transfer hearing that provided for a consideration of that individual's maturity and moral responsibility as a pre-condition to transfer for trial as an adult.  *Id.* at 375-76.[9]

---

[9]    The Kentucky statute required the court to determine that transfer to adult court would be in the best interest of the child and the community and consider the following factors: seriousness of the offense, maturity of the child, any prior record, prospects for adequate protection of the public, and the likelihood of reasonable rehabilitation.  *Stanford,* 492 U.S. at 377 n.6.  The Missouri statute required the court to consider the seriousness of the offense, whether it was part of a repetitive pattern of

-48-

¶106    The State cites *Thomas v. Virginia,* 419 S.E.2d 606 (Va. 1992), to support its argument that *Stanford's* individualized consideration requirement is satisfied by Arizona's recognition of age as a statutory mitigating factor that is entitled to great weight.  *See* A.R.S. § 13-703(G)(5).

¶107    But even if *Thomas* supports the State's argument, we simply disagree.  The focus of a mitigation hearing is on leniency, a concept fundamentally different from the assessment of whether a juvenile defendant has the requisite moral responsibility and culpability to be held accountable to the same degree as an adult. We therefore conclude that, in the context of our capital sentencing scheme, the consideration of a juvenile defendant's age as a statutory mitigating factor, standing alone, is insufficient to provide the individualized consideration required by the *Stanford* decision.

¶108    Because no assessment of Davolt's maturity was made before trial, we cannot determine whether he possessed the requisite responsibility and culpability to be constitutionally eligible for the death penalty.  The lack of such assessment, however, does not necessarily require the death sentence to be

---

offenses, the record and history of the child, including experience with the juvenile justice system or other courts, the sophistication and maturity of the child determined from his home and environmental situation, emotional condition and pattern of living, and potential to benefit from rehabilitation.  *Id.*

vacated. The trial court, on remand, should make every effort to determine, if possible, the extent of Davolt's maturity and moral responsibility at the time he committed the murders. Although conducting such analysis at the present time may be difficult in light of the several years that have passed since the crimes were committed, *see Drope v. Missouri*, 420 U.S. 162, 183 (1975), the passage of time is not necessarily fatal to the effectiveness of such a hearing, *see, e.g., United States v. Makris*, 483 F.2d 1082, 1092 (5th Cir. 1973); *Boltz v. Oklahoma*, 806 P.2d 1117, 1121-22 (Okla. Crim. App. 1991).

¶109    If the trial court finds it cannot engage in an appropriate determination of the issue, or if the court concludes that when Davolt committed the offenses, he did not possess the necessary moral responsibility and culpability to be constitutionally eligible for the death penalty, then Davolt's death sentences must be vacated, and the trial court must impose sentences of life or natural life. If, however, the court concludes that, at the time of the offenses, Davolt indeed was a person sufficiently mature to possess requisite moral responsibility and culpability, then Davolt's death sentences cannot be said to violate the Eighth Amendment. If the trial court finds Davolt's death sentences constitutional, then it shall transfer the case to this court for further action pertaining to sentencing issues under *Ring v. Arizona,* 536 U.S. 584 (2002) (*Ring*

*II*).

¶110    In sum, because we find that the consideration of age alone as a statutory mitigating factor is insufficient in the context of our capital sentencing scheme to provide juvenile defendants with the individualized consideration mandated by the Eighth Amendment, we hold that the State may not seek the death penalty against a juvenile pursuant to Arizona's Automatic Filing Statute, A.R.S. § 13-501, without an individual assessment of the juvenile's maturity and moral responsibility at the time of the offense.  We emphasize that we do not preclude the State from seeking the death penalty against juvenile defendants, but require that it do so in conformity with the U.S. Constitution. Accordingly, we remand this case to the trial court for proceedings consistent with this opinion.

## B.    *Ring II* Error

¶111    Because we cannot say at this time whether Davolt's death sentences violate the Eighth Amendment, our consideration of sentencing issues under *Ring II* must await the decision of the trial court on remand.  Only in the event the court finds Davolt eligible for the death penalty will we consider the effect of *Ring II* on the capital sentences heretofore imposed.

## C.    Sentencing on Non-Capital Counts

¶112    Davolt alleges the trial court erred by failing to consider age as a proven mitigator when determining sentencing on

the non-capital counts.  In addition, Davolt argues the trial court erroneously failed to allow credit for time served on the non-capital sentences.  Sentencing determinations are reviewed for abuse of discretion.  *State v. Patton,* 120 Ariz. 386, 388, 586 P.2d 635, 637 (1978).

¶113    Arizona law requires that the trial court  "consider the age of the defendant" as a statutory mitigating circumstance when determining sentences imposed for non-capital offenses. A.R.S. § 13-702(D).  Our review of the record indicates that the only statutory mitigating circumstance found by the trial court with respect to the non-capital counts was Davolt's lack of a significant criminal record.  The trial court erred by refusing to consider Davolt's age as a statutory mitigating circumstance when determining sentences on the non-capital counts.  We therefore vacate the sentences imposed on all non-capital counts and remand those counts to the trial court for resentencing.  In addition, we note that Arizona law requires that Davolt be given credit for time served against any term of imprisonment imposed.  *See* A.R.S. § 13-709(B).

### CONCLUSION

¶114    We affirm Davolt's convictions in each instance, but remand to the trial court to determine whether, at the time of the offense, Davolt possessed moral responsibility and culpability sufficient to render him eligible for the death penalty.

¶115    In addition, we vacate the sentences imposed on Davolt's non-capital convictions by reason of the trial court's failure to consider age as a statutory mitigating factor.  The non-capital counts are remanded for resentencing consistent with today's opinion and in accordance with Arizona's statutory sentencing scheme.

_____
                                    Charles E. Jones, Chief Justice
CONCURRING:

_____
Ruth V. McGregor, Vice Chief Justice

_____
Rebecca White Berch, Justice

_____
Michael D. Ryan, Justice

_____
M. Jan Florez, Judge

    NOTE: Justice Andrew D. Hurwitz recused himself in this
    matter  and M. Jan Florez, a Judge of the Arizona Court
    of Appeals, Division Two, sat in his stead, pursuant to
    Article 6, § 3 of the Arizona Constitution.