433 P.2d 18

STATE of Arizona, Appellee,

v.

Genaro Salazar GARCIA, Appellant.

No. 1754.

Supreme Court of Arizona.

In Banc.

Oct. 26, 1967.

Darrell F. Smith, Atty. Gen., Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

R. Lamar Couser, Tucson, for appellant.

LOCKWOOD, Justice:

Defendant was convicted of second degree murder of Jose Cardenas and sentenced to serve a term in the Arizona State Prison of not less than ten years nor more than fifteen years. From such judgment and commitment he brings this appeal.

The facts are viewed to support the verdict. State v. Valenzuela, 101 Ariz. 230, 418 P.2d 386 (1966). On June 27, 1966, defendant was at the home of his fiance's parents, Mr. and Mrs. Granillo, in Tucson. Defendant's fiance, Maria Isabel Granillo, had already given birth to one child of the defendant's and at the time was recently pregnant by him again. Maria had also given birth to three children of the victim, Jose Cardenas, though it appears that Maria and Cardenas were also never formally married.

In the early evening of June 27, 1966, Cardenas, in a car owned and operated by a

female companion, Maria Montoya, passed in front of the Granillo home. Cardenas, thinking he heard someone at the Granillo home call him a vulgar name, requested his girl friend to stop the car and back up to the home.

At the time the defendant was sitting on a couch in front of the home drinking coffee and playing a guitar in the company of Santos Granillo, brother of the defendant's fiance. Cardenas and Montoya got out of the car and proceeded to engage in name calling with the Granillo family while remaining outside the fence and open gate. At the time, both Cardenas and Montoya appeared to be intoxicated.

During the ensuing disturbance defendant Garcia refrained from speaking to either Cardenas or Montoya. Cardenas had beaten Maria and her father in the past, and had made threats "to get" Garcia. The defendant stepped into the Granillo home but could still hear and see the argument. Maria and her mother, Mrs. Granillo, went out to the gate and joined Santos Granillo in arguing with Cardenas and Montoya.

After a period of time, Maria returned to the house and brought out a small chain, being about 20½ inches long when doubled, with each link about ¼ inch in diameter with a 2 inch pressure snap at the end.

The continuing argument became somewhat violent, Montoya grabbing the elderly Mrs. Granillo and pulling her about, in the process causing Mrs. Granillo's finger to be cut. Montoya also threw a "large rock" but hit no one. Cardenas took the small chain from Maria and began swinging it at her in a menacing manner. During all of this, Santos Granillo apparently thought there was no danger as he was doing nothing to protect his sister nor to help his mother.

The husband of Mrs. Granillo was in the house with the defendant and apparently on his own initiative was proceeding to load his .38 pistol. At this stage, the defendant claims that Maria Granillo screamed and called to him for help. Feeling that it was "his right" to defend his pregnant fiance,

the mother of one of his children, from any harm, the defendant grabbed the pistol from Mr. Granillo, rushed from the house and shot Cardenas.

Although Cardenas had not yet harmed anyone, the defendant claimed he thought Cardenas had already used the chain on Maria. Defendant did not attempt to ascertain if in fact the deceased had harmed or was harming anyone. Upon coming within a short distance of the deceased, the defendant told him to leave and shot him at the same time. There is some doubt as to how many shots were fired, it appearing to be anywhere from two to five. Medical testimony indicated that at least two shots caused the wounds in the body.

Cardenas did not die on the spot. He fell to the ground and then was assisted into the automobile by Montoya and was eventually brought to a hospital where he died approximately three hours after the shooting.

The defendant placed the gun on a bed in the Granillo's home and went to his own house. He disclosed the deed to his mother who expressed disbelief. Defendant left his home and spent the entire night behind a fence near his house. Early the next morning, he turned himself in to the authorities.

█ Defendant appeals to this Court on the ground, among others, that it was prejudicial error for the trial court to refuse to replace one of the jurors with an alternative juror during the trial, or in the alternative, to declare a mistrial. Defendant's objection to the juror was that the latter concealed relevant information. Though there is no record of the exact question asked, it appears that during voir dire of the prospective jurors the jury panel was interrogated respecting any connection individual members might have with the Tucson Police Department. The juror in question remained silent to the question notwithstanding the fact he was an uncle by consanguinity of a member of the police force. Defendant discovered this during the trial of the case and called it to the

attention of the trial court. The trial court denied defendant's motions for juror replacement and mistrial. Defendant argues that had he known that the juror was related to a member of the Tucson Police Department he would have challenged the juror for cause. As the silence of the juror precluded defendant from challenging for cause defendant claims that there was an abridgement of his right to both challenge for cause and to exercise peremptory challenges.

In reaching this conclusion, defendant relies upon a 1933 Kentucky case. Drury v. Franke, 247 Ky. 758, 57 S.W.2d 969 (1933), 88 A.L.R. 917. In this case, counsel asked the prospective jurors a question pertaining to involvement they may have had in any automobile accidents and in any litigation similar to the case before that court. It was discovered after the trial that four jurors who should have responded to the question remained silent and thus misled counsel. The Kentucky court held that where a juror by not responding, gives false information in his voir dire examination and it is relied upon, the right to a new trial follows as a matter of law. The court reasoned that the right to challenge involves the incidental right that the information elicited from the juror must be true, and if a party is misled by erroneous information, his right of rejection is impaired.

The Drury case is not directly on point. It was clearly demonstrated that at least one of the four erring jurors in the Drury case had knowledge of his disability. In the present case no positive facts are presented to show that the juror in question had knowledge at the time of voir dire or any time during the trial and jury deliberation that one of his 28 nephews was a member of the Tucson Police Department. Further, the ground for objection to the jurors in the Drury case was their past personal experience and present personal knowledge based on similar litigation and involvement in automobile accidents, and not, as in the case before us, based upon status by "any connection" with an organization.

Defendant also relies upon another Kentucky case, Nuchols v. Commonwealth, 312 Ky. 171, 226 S.W.2d 796, 13 A.L.R.2d 1478, (1950) involving a criminal charge. The information the juror suppressed concerned the fact that he had served as a juror within the last twelve months. Such service constituted *a statutory ground of challenge for cause* and this fact played a decisive role in the court's reasoning.

Rule 219 of the Arizona Rules of Criminal Procedure, 17 A.R.S. lists the grounds to challenge for cause. Defendant's alleged error falls into none of these categories. The closest to his situation is subsection A, par. 4 which states that a juror is subject to challenge if the juror is related by consanguinity or affinity within the fourth degree to (1) the person alleged to be injured by the offense charged; or (2) to the person on whose complaint the prosecution was instituted; or (3) to the person who is the defendant. The juror the defendant objects to does not fall within any of the prohibited relationships.

Further, Kentucky itself has distinguished the *Drury* view in later decisions upon reasons which appear valid and applicable here. In Crutcher v. Hicks, (Ky.); 257 S.W.2d 539, 38 A.L.R.2d 620 (1953) two jurors did not respond to a voir dire question concerning their involvement in damage claim litigation. The court refused to follow *Drury* stating:

"Even if we accept the *extreme and highly technical view* which some parts of the [Drury] opinion would indicate, it does not necessarily follow that false or misleading information elicited on voir dire examination will invariably and in all cases result in an illegal verdict. If the false information is of such character as to indicate probable bias on the part of the juror, it may be presumed that a free exercise of the right of peremptory challenge has been so restricted as to result in prejudice to the party affected. *However, if information innocently withheld or given, although false, is so insignificant or trifling as to indi-*

*cate only a remote or speculative influence on the juror, the right of peremptory challenge has not been affected."* (Emphasis added.) 257 S.W.2d at 540.[1]

The defendant before us asserts that he has been prejudiced by the relationship of the silent juror but he fails to support this assertion with any positive facts. The transcript discloses that two officers from the Tucson Police Department testified. Neither of these officers was the nephew of the juror. Their testimony was not relevant to any of the dispositive issues. The testimony of the officers went only to a prior argument over possession of an iron, which did not involve the defendant, and also went to the number of empty shells found on the ground after the shooting. Defendant infers that the relationship of the uncle to a noninvolved nephew, of whose employment on the police force the uncle may or may not have known, is per se fraught with evil and has necessarily resulted in a prejudiced verdict. To induce that such a tenuous connection by one juror to a nonwitness is preclusive of a fair verdict of all twelve members of the jury is a mighty calibration of a simple aberration. This court cannot agree with such a conclusion.

■ Defendant also contends that the trial court erred in failing to give to the jury separate verdict forms for voluntary manslaughter and involuntary manslaughter. The verdict form submitted to the jury, along with other verdict forms, made no distinction between the two, merely characterizing the offense under the title "manslaughter". The defendant argues that this did not allow the jury to consider the quantum of the offense. We do not agree.

We have held that although the law does not make it the duty of the court to submit forms of verdict to the jury, when the court does do so, it should give a form of every kind of a verdict that may possibly be returned by the jury. State v. Griffith, 92 Ariz. 273, 376 P.2d 134 (1962); West v. State, 24 Ariz. 237, 208 P. 412 (1922). But unless the omission prejudiced the defendant it will not be held reversible error. Ibid.; Ariz. Const., Art. 6, § 27 (as amended 1960), A.R.S. As the difference in the types of manslaughter were fully explained in the court's oral charge, the omission did not prejudice defendant.

Defendant assigns as additional error the fact that the trial court forced counsel to exercise their peremptory challenges in the presence, close proximity, and hearing of the prospective jurors. Defendant asserts that because it was impossible to even whisper without being heard, his co-counsel could not effectively communicate and freely discuss each prospective juror without risking possible prejudice, thus interferring with the intelligent and effective exercise of strikes.

■ The trial court treated the defendant's motion as one for mistrial. We have held that this court will not disturb denial of a motion for mistrial unless it appears there has been an abuse of discretion. State v. George, 100 Ariz. 350, 414 P.2d 350 (1956). If the defendant's co-counsel were in fact unable to verbally discuss the prospective jurors, reasonable alternatives appear to have been available, such as written communication or asking for a brief recess. We hold that requiring counsel to make strikes in the presence of the prospective jurors is not prejudicial error when counsel has other reasonable alternatives available which would preclude any bias arising from the peculiarities of the environment and when there is no showing of prejudice.

The refusal to give seven of the defendant's and one of the State's requested instructions to the jury is also assigned as error. These refused instructions con-

---

[1]. See also Turner v. Hall's Adm's (Ky.), 252 S.W.2d 30 (1952). At least one other jurisdiction has also distinguished *Drury* or disapproved its ruling. See Laugherty v. Newcomb, 237 F.Supp. 524 (E.D.Tenn.N.D., 1962); Thomas v. Hodges, 201 Tenn. 313, 299 S.W.2d 1, 63 A.L.R.2d 1059 (1957).

cerned the implication of malice, excusable and justifiable homicide, self defense and defense of others, previous acts of violence of the deceased, and evidence of the good character of the defendant. The refusal was proper as the appropriate rules of law were sufficiently covered in the instructions given by the court to the jury.

 Defendant also argues that the trial court erred in giving instructions on flight of the defendant and on heat of passion. Defendant contends that there was no evidence of flight and that the instruction on heat of passion constituted comment on the evidence as well as being incomplete. We do not agree. Uncontradicted testimony from the defendant reveals that he concealed himself out of doors behind a fence all night for a period of nearly twelve hours directly after committing the crime. The instruction on flight correctly stated the law and did not contain a comment on the evidence. Further, the instruction on the heat of passion while somewhat lengthy, was stated hypothetically, was not incorrect, and did not constitute a comment on the evidence.

Affirmed.

BERNSTEIN, C. J., McFARLAND, V. C. J., and STRUCKMEYER and UDALL, JJ., concur.