NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

_____

BETHANY C., *Appellant*,

*v.*

ARIZONA DEPARTMENT OF CHILD SAFETY, J.C., G.C., *Appellees*.

No. 1 CA-JV 15-0024
FILED 8-25-2015

_____

Appeal from the Superior Court in Maricopa County
No.  JD509925
The Honorable Brian K. Ishikawa, Retired Judge

**AFFIRMED**

_____

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Michael J. Brown and Judge Kent E. Cattani joined.

---

H O W E, Judge:

¶1            Bethany C. ("Mother") appeals the juvenile court's order terminating her parental rights to her two minor children, J.C. and G.C., on the ground of 15 months in out-of-home placement pursuant to court order under A.R.S. § 8–533(B)(8)(c). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2            One December day, nine-year-old C.A. called her father Joshua—Mother's ex-husband—from Mother's house. Joshua arrived at Mother's house and found C.A. and her two half-siblings, J.C. and G.C., home alone. Joshua called the police. They responded and unsuccessfully attempted to contact Mother. Mother had gone to a bar and left C.A. in charge of three-year-old J.C. and one-year-old G.C.

¶3            As a result, the Arizona Department of Economic Security[1] investigated and instituted in-home services, including family preservation and 24-hour daycare. While working with the Department, Mother exhibited basic parenting skills, but needed to improve her parenting skills, such as picking up on the children's social cues, and frequently had her children nap, demonstrating her lack of patience with the children. Meanwhile, her home was infested with cockroaches and often in disarray, with food on the floor and toys throughout.

¶4            Although Mother continued services, the Department suspected that she was still leaving her children home alone. That suspicion was confirmed in February 2012 when the case manager received a report that Mother had walked around her apartment complex looking for someone to watch her children overnight. She left her children—with no

---

[1]     The Arizona Department of Economic Security is substituted for the Arizona Department of Child Safety in this matter. *See* Ariz. R. Civ. App. P. 27; S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted). For convenience, we refer to both as "the Department."

clothes, diapers, or shoes—with a neighbor, who had trouble finding Mother the next day to return the children.

**¶5** The Department consequently intervened and placed the children in an out-of-home placement. A couple months later, they were transferred to Joshua's home. The case manager discussed with Mother her ability to provide for the children's care, safety, and stability. He noted specifically that Mother had mental-health issues, had not bonded with her children, had left the children home alone or with unwilling caregivers and strangers, and that her home was cluttered and infested with bugs. The Department offered Mother parent aide services, a psychological consultation, and supervised visitation and petitioned for dependency. The juvenile court adjudicated the children dependent and ordered family reunification as the case plan.

**¶6** To eliminate the safety threats and risk factors identified in the case plan, Mother was expected to consistently visit her children, accept the parent aide's recommendations, address mental-health concerns, accept responsibility for her actions, and complete a psychological evaluation and follow the recommended services. To help Mother, the Department offered psychological consultation; a psychological evaluation; and parent aide, family preservation, and transportation services.

**¶7** Mother completed parenting skills classes and had supervised visitation with the children. The supervised visits "successfully" closed after seven months. Mother had gained parenting skills, understood the children's expectations, could secure their safety, and was nurturing them.

**¶8** Mother then began unsupervised visits, but several months later, the Department suspended those visits. Both children reported to the case manager that during the unsupervised visits, Mother spanked them, was mean, did not give them food, put them in time-out for long periods of time, and had them nap for long periods of time. The children's parent aide reported that they would stall going to the visits. Because of the children's reports, the case manager contacted a clinical psychologist. The psychologist opined that "the visits [were] traumatizing to the children" and recommended suspending them.

**¶9** Meanwhile, the Department offered services to Mother to address her mental-health issues. She engaged in individual therapy and psychological evaluations. Mother completed one psychological evaluation in June 2012. The psychologist diagnosed Mother with an Adjustment

Disorder with Mixed Anxiety and Depressed Mood. She recommended that Mother participate in individual trauma-based therapy, parenting sessions, and parent aide services. Eight months later, Mother had a follow-up session. The psychologist again recommended individual therapy services—this time with a forensically-informed doctoral-level therapist—and parent-child interaction therapy.

¶10         Thereafter, Mother engaged in individual-trauma therapy to address, among other things, her history of domestic violence. Mother's individual therapy closed out because she met the treatment goals. Her group therapy closed out, however, because she stopped attending.

¶11         Mother and the children consequently engaged in family relational and filial therapies, child-parent psychotherapy, and parent-child interaction therapy. Their therapist reported that during filial therapy sessions, Mother was unable to identify "a comfortable level of comfort and affection with them." When the children were affectionate, "oftentimes she interpreted it as invading her space or being rude or being mean in some way." Mother often used "a very harsh tone" with the children and called them mean; misinterpreted their age-appropriate actions; used excessive time-outs, without explaining why they were in time-out or redirecting them; and could not comprehend the children's cues. The therapist's efforts to redirect Mother were unsuccessful.

¶12         As a result of Mother's actions, the children "became more subdued," "[m]ore anxious," and sometimes asked Mother if she was mad at them. The therapist also observed the children with their foster parents and found them to be much different. The children were affectionate with their foster parents, constantly engaged them in their play, and felt very comfortable directing and asking them for help. The therapist described them as carefree, playful, talkative, and imaginative.

¶13         Mother next engaged in parent-child interaction therapy with another therapist in October 2013, but that service was discontinued after four sessions. Mother was "very passive" during sessions and "argumentative" with this therapist. The therapist ultimately recommended that the sessions be discontinued because G.C. was "becoming more anxious and withdrawn."

¶14         In January 2014, a third therapist conducted a bonding/best-interest assessment with Mother, the children, and the foster mother. The therapist noted, "some attachment exist[ed] between the children and their mother, but it would appear to be an anxious attachment." They were

"hesitant in their interactions with her and nonresponsive to her directions." In contrast, they "played independently with the foster mom," "utilize[d] her as a secure base," and were "relaxed and followed her directions well."

¶15          Mother's interactions with the children "were mechanical," and "she demonstrated no empathy or warmth towards the children" and seemed "unable to recognize their needs for nurturance and warmth." The therapist opined that the children were in need of permanency and stability and that the Department should identify an adoptive home for the children and pursue permanent placement.

¶16          Mother subsequently employed her own psychologist for a best-interest evaluation. He diagnosed Mother with Bipolar II Disorder, current/most recent hypomanic. This psychologist noted that in contrast to the reports he had received about Mother, she "was not only aware of their individual needs and interests but she was also prepared to address them in a comfortable way for the children." He recommended that she receive individual-trauma therapy and have visitation with the children.

¶17          When the children had met their goals and were doing well in their foster home, counseling sessions were discontinued. One of their therapists opined that they should remain with their foster parents and that they would benefit from permanency through adoption because they would have a sense of safety and security and thrive in their foster parents' care. That same month, the Department moved for termination of Mother's parental rights. It contended that the children were being cared for in an out-of-home placement and had been in an out-of-home placement for a cumulative total of fifteen months or more pursuant to court order.

¶18          Before the severance hearing and as relevant here, Mother objected to the admission and use of psychological reports "unless the State presents the author of the report and/or documentations and removes all statements" that originated from someone other than the author. Mother's attorney subpoenaed the psychologist the Department had retained. The psychologist later requested release, however, because Mother refused to pay her.

¶19          At the severance hearing, the State and Mother stipulated to admission of exhibits 2, 3, 4, 32, and 34. Mother's exhibits 3 and 4 were copies of the psychologist's reports and exhibit 2 also included copies. The State's exhibits 32 and 34 were also copies of the reports. The juvenile court quashed the psychologist's subpoena because Mother would not pay her,

but gave Mother the opportunity to show that she was not required to. Mother did not do so, but reiterated her same arguments in a motion for reconsideration, which the trial court denied.

**¶20**     Joshua testified that the children were his daughter's half-siblings and that they had bonded with his family and were comfortable in the family's home. He explained that his family could provide the children with a safe, stable, and loving home and that they were currently meeting and could continue to meet the children's needs. He also testified that if given the opportunity, his family would adopt the children.

**¶21**     The case manager testified that the children had been in an out-of-home placement pursuant to court order for 34 cumulative months. He also testified that the children's current placement, their older half-sibling's home, was willing to adopt them and that the foster parents would be able to meet the children's needs.

**¶22**     After considering the evidence and counsels' arguments, the juvenile court terminated Mother's parental rights pursuant to A.R.S. § 8–533(B)(8)(c), finding that they had been in an out-of-home placement for over fifteen months pursuant to court order and that termination was in the children's best interests. Mother timely appealed.

## DISCUSSION

**¶23**     As relevant to our disposition of this appeal, Mother argues that the juvenile court violated her due process rights by quashing the psychologist's subpoena, that it erred by admitting the psychologist's reports without her testimony, and that the evidence did not support its finding that a substantial likelihood existed that Mother was incapable of exercising proper and effective parental care in the near future. We review constitutional claims de novo, *State v. Nordstrom*, 230 Ariz. 110, 117 ¶ 27, 280 P.3d 1244, 1251 (2012), but because Mother raises the due process claim for the first time on appeal, we review for fundamental error only, *see Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 239 ¶¶ 15–16, 282 P.3d 437, 440 (App. 2012). Mother therefore bears the burden of establishing that error occurred, the error was fundamental, and the error caused her prejudice. *Id.* at 239 ¶ 16, 282 P.3d at 440. Moreover, because a juvenile court has broad discretion in admitting evidence, we will not disturb its decision absent a clear abuse of discretion and resulting prejudice. *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 82–83 ¶ 19, 107 P.3d 923, 928–29 (App. 2005).

**¶24**     Here, we need not address whether the juvenile court erred in quashing the subpoena or whether it properly admitted her reports

because any arguable error was harmless. *See State v. Davolt*, 207 Ariz. 191, 205 ¶ 39, 84 P.3d 456, 470 (2004) (providing that error is harmless when "the reviewing court can say beyond a reasonable doubt that the error did not contribute to the verdict"); *Alice M. v. Ariz. Dep't of Econ. Sec.*, 237 Ariz. 70, 73 ¶ 12, 345 P.3d 125, 128 (App. 2015) (providing that even if the juvenile court erred in admitting disputed exhibits, the error was harmless). Sufficient evidence, even without the psychologist's reports, supports each element of termination on the ground of 15 months in out-of-home placement.

¶25 We review a juvenile court's termination order for an abuse of discretion. *Angel S. v. Dep't of Child Safety*, 237 Ariz. 132, 136 ¶ 12, 347 P.3d 578, 582 (App. 2015). We accept the court's factual findings unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1, 200 P.3d 1003, 1005 (App. 2008).

¶26 As pertinent here, to terminate parental rights for time in an out-of-home placement, the juvenile court must find by clear and convincing evidence that (1) the children had been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order; (2) the parent has been unable to remedy the circumstances that caused the children to be in an out-of-home placement; and (3) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41, 110 P.3d 1013, 1022 (2005). In its determination, the court must consider "the availability of reunification services to the parent and the participation of the parent in these services." A.R.S. § 8–533(D). Moreover, the court must find by a preponderance of the evidence that severance is in the children's best interests. *Kent K.*, 210 Ariz. at 288 ¶ 41, 110 P.3d at 1022.

¶27 Because reasonable evidence supports the juvenile court's order terminating Mother's parental rights and finding that the termination was in the children's best interests, the court did not abuse its discretion. First, the record shows that on the date of the severance hearing, the children had been in an out-of-home placement pursuant to court order for 34 cumulative months. Second, the record shows that the Department made diligent efforts to provide appropriate reunification services for Mother, including parent aide services, supervised and unsupervised visitations, a psychological consultation, two psychological evaluations, a bonding/ best interest assessment, individual-doctoral level-trauma therapy, parenting classes, and family therapy, which included parent-child interaction

therapy. Although Mother participated in these services, she failed to make the necessary behavioral changes that allowed for family reunification. In parent-child interaction therapy, Mother was passive during play sessions and argued with the therapist about parenting techniques. In filial therapy sessions, she interpreted the children's affection as invading her space or being rude or mean.

¶28 Moreover, although Mother was successful during supervised visits, the record shows that she did not internalize the parenting skills she previously learned. The children reported that during the unsupervised visits, she spanked them, was mean, did not give them food, put them in time-out for long periods of time, and made them nap for long periods of time. In fact, a psychologist opined that the visits were traumatizing the children and therefore recommended suspending the visits. Consequently, despite knowing that she was expected to accept the parent aide's recommendations and responsibility for her actions, Mother would not use the suggestions for extended periods of time and instead "revert[ed] back to her previous parenting paradigm."

¶29 The record also shows that Mother was unable to remedy the circumstances that caused the children to be in an out-of-home placement. The Department was initially concerned about Mother's failure to bond with the children and her mental-health issues. Even though Mother engaged in a variety of services, including therapy sessions by herself and with her children, she was unable to bond with them. Further, although one psychologist noted that Mother had bonded with the children, all others involved noted that Mother's interactions with her children remained mechanical and that she demonstrated no empathy or warmth towards her children and was unable to recognize their needs. This continued even after receiving and completing individual-trauma therapy. Consequently, the record reveals that a substantial likelihood exists that Mother will not be capable of exercising proper and effective parental care and control in the near future.

¶30 Finally, the record shows that termination was in the children's best interests. *See Angel S.*, 237 Ariz. at 141 ¶ 33, 347 P.3d at 587 ("In determining whether the child would benefit, relevant factors to consider include whether the current placement is meeting the child's needs, whether there is an adoption plan in place, and whether the child is adoptable.") (internal citation and quotation marks omitted). The case manager and the children's foster father testified that their foster family was willing to adopt them. The case manager and foster father also testified that the foster family was meeting and could continue to meet the children's

needs. Several individuals who observed the children with Mother and with their foster parents noted that, in contrast to their interactions with Mother, the children were affectionate with their foster parents and were comfortable directing and taking directions from them. Consequently, even without the psychologist's reports, reasonable evidence supports the juvenile court's order terminating Mother's parental rights and finding that the termination was in the children's best interests.

## CONCLUSION

¶31      For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama